25-2079, Ms. Davis. Good morning, your honors, and may it please the court. Today, this case concerns the most protected space under the Fourth Amendment, the home. And to search one's home, the government needs probable cause, which requires specific, reliable facts that have a fair probability linking evidence of a crime to that home. That did not happen here. This is for two primary reasons. First, the government did not establish the required nexus between criminality and the Euclid address that was searched in this case. Second, the good faith exception cannot save this warrant affidavit. To the first point about the required nexus, here the government does list a myriad of facts purportedly alleging criminality, but that is not enough. There must be criminality that is linked to the home that is searched. Here, that did not happen. To start with the confidential informant's statements, which the government primarily relies on, the confidential informant made statements to Special Agent Acey that Mr. Cangro could get drugs and guns for sale if the confidential informant wanted them. However, the confidential informant never links this to the Euclid address. Do you admit there's enough from the confidential informant as to criminality? There could be enough to assert some type of crime. However, this could also just be a fairly specific crime. Yes, there could be evidence that there might be a crime of getting drugs and guns. However, this could be bluster of someone that wants to look cool. But you don't challenge that portion of the issue with respect to the affidavit supporting the warrant? No, Your Honor. It's just the nexus between the Euclid property and that crime? Correct. There is no nexus here between any alleged crime, which the confidential informant may have alleged enough for some type of crime to happen someplace, somewhere, but not at the Euclid address that was eventually searched. The confidential informant never links any type of evidence or even an assinuation that there is going to be evidence of criminality at the Euclid address. In fact, when this investigation started into Mr. Cangro in February 2022, the Euclid address was not even part of the investigation because only a few days prior to the execution of the warrant did Mr. Cangro purportedly start moving into the Euclid address. We do have case law that suggests, I think Judge Phillips mentioned it on a prior case, that people who have firearms and also people who have drugs tend to keep them in their home. Yes, there are several cases where that is enough when the confidential informant provides sufficient facts and there is corroboration showing that some type of criminality happened at the home and officers inference that drugs and guns are often kept at the home may be enough. However, that's not the case here. There is not enough. In all of those other cases, there was more that would lead to a reasonable suspicion that there would be criminality, evidence of criminality at the home, including that the confidential informant bought drugs from the defendant in those cases, saw drugs and guns at the residence, actually alleged to have been at the residence. Here, none of that exists. The confidential informant never alleges that he or she even saw drugs or the drugs that Mr. Cangro was purportedly going to sell, that the confidential informant even went into the Euclid address. So here, that would not apply because the confidential informant and the additional surveillance that SAAC did just is not enough. It does not show enough for a reasonable suspicion of criminality occurring at the Euclid address. Counsel, do you have any cases that say what you just said? Well, a case that would say you can't draw an inference that drugs, maybe records of drug dealing or whatever, some evidence, we can infer that without having any direct observation. I mean, you're making a direct observation test, I think. And I'm wondering if there are any cases that say you have to have a direct observation. There's no inference. I wouldn't say there's cases that explicitly say a direct observation is needed, but there are cases where when there is not a direct observation or that direct observation is stale, it is not enough. For instance, U.S. v. Cordova and U.S. v. Roach both show that when there's some observation of officers or a confidential informant that there was even a drug deal or more than is in this case happening months prior, that is not enough to establish a nexus between the criminality and the home. Here, the only allegations are that Kangaroo could get drugs and guns at some point in some time. All of the cases that do find that there is enough of a nexus to support that inference, that drugs and guns are kept at the home, have more. So it's more of a compilation of cases showing that when that inference is supported, there is more evidence to back it up or there is more of a reasonable suspicion to back it up. So really you're basing it on it could have been bluster. It could have been bluster. But even if it wasn't bluster, even if you want to assume that there was some type of criminality happening, criminality at some place at some point in time is not enough for the search of a home. There needs to be more. There needs to be that nexus to that criminality and the home. And the drugs and the guns don't supply that by itself? There are no drugs in this case up to this point. The confidential informant doesn't see any drugs. And the assertion that Kangaroo had a gun on his waistband happened months prior. And there are multiple cases, including U.S.V. Roach, U.S.V. Nolan, that state that in drugs and gun trafficking cases specifically, that evidence is unlikely to show stationary and that it's unlikely to be in one place for more than weeks or a few months at a time. On appeal, Mr. Kangaroo is not contesting that he, in fact, resided at Euclid. Is that right? No. The Euclid address was Mr. Kangaroo. There's a contention that Mr. Kangaroo, there's enough evidence to place him at that evidence, at least a reasonable suspicion. There was surveillance that showed moving boxes, Mr. Kangaroo going in and out of the house, that there's not enough to support criminality at that home. In fact, the confidential informant even stated that Mr. Kangaroo was splitting time between different locations. So this even lowers the reasonable suspicion that criminality is going to be found at a home that he is purportedly moving into just a few days prior. Assuming we agree with you that the warrant was based on insufficient nexus, why doesn't this fall under the good faith exception? We've put a pretty high standard on preventing a good faith exception. And that's based on Supreme Court authority. So why doesn't this fall easily within the good faith exception? Correct, Your Honor. The good faith standard is quite a high standard to meet. A high standard for a defendant to defeat.  However, this is for two primary reasons. First, that because the lack of nexus was so deficient on the face of the warrant affidavit, that there's just not enough for a reasonable officer to think that something could be there. For instance, in Suggs 2, Chief Judge Phillips, your dissenting opinion even stated that we presume that officers know the law, including that there needs to be a nexus between the criminality and the home. And that when that's the void on the face of the affidavit, then our inquiry ends there. There's just not enough and the good faith exception does not apply. However, if your honors disagree that they're just on the face of this affidavit, there is no nexus, which defendant contends that on the face it is not enough. There are material misrepresentations and omissions that were recklessly included in this warrant affidavit. Is that a new argument? No, your honor. This is included in our briefing. So the reckless omissions here include that reference to a probation officer search of seven months old where Mr. Kangro was living with a then girlfriend that found certain contraband in the home. But this was seven months prior and Special Agent Acey also lists out the types of contraband that was found at the home, the different investigation, including a picture that he links to Mr. Kangro of a purported gun. However, in the U.S. Probation Officer Memo that Agent Acey reviews to include this in his warrant affidavit, it's also stated that that gun is purportedly an Airsoft gun that belonged to Mr. Kangro's girlfriend's son. And so this is just one example of Special Agent Acey cherry-picking information out of the underlying facts and documents in this case to present Mr. Kangro in the worst possible light. Is the universe of what you're talking about in your cut-and-pasted version of the affidavit? Sorry, could you? The additions, the deletions? I'm not sure I'm understanding your honor's question. I'm sorry. In the motion to suppress, the affidavit does include all of these different omissions, strikes, the falsehoods, and that is included in the motion to suppress. And we do bring up in our briefing the various omissions and recklessly false information. I'm happy to... What I'm talking about is there's an application for a warrant and it is the application, but then there are things that are added into this, which I think are the points that you're making. For example, just opening it and not choosing any one particular paragraph 23, there's an addition. However, and the lighting is so bad up here. In 2005, Kangro denounced his membership in SAC. That's not as part of the original. No, no, that is an exhibit in the defense counsel's motion to suppress that they included to show had certain statements that were shown to be recklessly false or omissions that were excluded that should have been included were there, it would have shown that this just was recklessly false omissions and statements. And that's my question is, what's in this document with the additions and the deletions, is that the universe of what you're relying on for reckless or intentional? Yes, Your Honor. So, for instance, another example of where Agent A.C. cherry picked information or just included recklessly false information was this connection to Mr. Kangro and the SAC, where it was shown in a document that Special Agent A.C. cited to a case that Mr. Kangro was involved in. In that same documentation that Special Agent A.C. reviewed showed that Mr. Kangro was actually a witness in that case and testified against his former gang. This is clearly material because even Special Agent A.C. at the hearing stated that had he known this information, that he wouldn't have even sought the warrant. So this is the very definition of materiality. If he had known or just looked a little further on the document that he reviewed, then he would have seen that this connection he was trying to make between the SAC and Mr. Kangro was just not accurate and even would have led Special Agent A.C. to rethink this warrant affidavit. And he even said that we would not have been here today when discussing the hearing because he would not have done things the same way. And if there are no further questions, I would like to reserve the remainder of my time for rebuttal. Very well. Thank you, Your Honors. May it please the Court. My name is Paul Mischlevitz. I represent the United States in this case. If it pleases the Court, I want to correct a factual statement that my colleague just made when she told you during her argument that Kangro said he could get guns and drugs if the CHS wanted him to. That is not what Special Agent A.C. put in the affidavit. When you look at, I'm looking at Record on Appeal Volume 2, page 58, paragraph 41, what the CHS reported to Brian A.C. was that Kangro had firearms and fentanyl for sale and to contact Kangro if the CHS wanted them. Obviously, if fentanyl was coming to Albuquerque from Arizona, which is the phenomenon that Special Agent A.C. was investigating, which led him to Kangro, among other people, someone saying I could get this if you wanted it is not the same as I have this, call me if you need it. And so I just wanted the Court to be clear on what was actually in the affidavit there. This Court should affirm the decision of Judge Garcia not to suppress any of the evidence in this case, primarily because the affidavit contains ample probable cause. And to answer your question, Presiding Judge Phillips, even Ms. Johnson, who was trial counsel for Kangro, even her version of the affidavit that includes all the things she might have liked Brian A.C. to have submitted to Judge Molson and withdraws everything she might have liked Special Agent A.C. not to have submitted to Judge Molson, even that affidavit has probable cause, which is one of the ways that you know that none of the statements that Special Agent A.C. made about Kangro or about his history or about the investigation of Kangro are material to the probable cause determination that Judge Molson made. Additionally, one of the legal things that my colleague said is that there must be a direct nexus between criminality and the residence to be searched. And as Judge Ide pointed out, she's really, to make is one verb, is the verb that Judge Ide used, but really I would say that she's asking this Court to make a rule that does not currently exist, that there has to be a direct observation of criminality at the house. We know that is not what we have, and one of the reasons we know that's not what we have is that the original warrant to look for drug and gun behavior by Mr. Kangro was for a different address, was for the Ross address. And when Special Agent A.C. prepared to serve that warrant on the April 13th, I think it was a Wednesday morning takedown, they saw in their surveillance, their pre-execution surveillance, that he had moved out. And so rather than search a place where he didn't live anymore, even though they may arguably have been authorized to do so, they ceased work and then started to find the place to which he had moved, which is where Brian A.C. sends the CHS out and says, go find where Kangro is now. CHS gives new and updated information about where he had moved to, and this is really contained most closely in paragraph 36, which is on page 57 of the second volume of the Record of Appeal. That he moved some of his property out to Edgewood, which as you know, you can take judicial notice, it's about 30 minutes east of Albuquerque. But he's also staying in a house on a cul-de-sac behind the New Futures School on Cutler. Brian A.C. drives there, sees Kangro's car at this Euclid address, comes back another time with Special Agent Vida Montes, sees the car again, sees another car associated with someone that he believes may have a relationship with Kangro at that time, and then seeks this warrant for the new and updated address. Of course no one has seen drug activity directly at that new address. The connection is between Kangro and the criminality, and then the new information is between Kangro and this new residence. And Special Agent A.C. was very upfront with that to Judge Molson when he sought this warrant that is now being challenged. The United States takes the position there's nothing improper about that, there's nothing reckless about that, there's nothing misleading about that. And if you look at Volume 3, which is the transcript of the—I think of it as a Franks hearing. I showed up ready for a Franks hearing. If you look at that transcript, one of the things Special Agent A.C. noted was that Judge Molson is not shy about telling him when she thinks his affidavit is insufficient, and he takes steps to correct that and present her with an improved affidavit. So that questioning was in the context of his good faith in the service of the warrant that he received from Judge Molson. But I present it now for the additional reason of explaining why the indirect connection between criminality and the residence, meaning the connection between Kangro and criminality, and then Kangro and this new residence, which is endorsed by this Court in its analysis in the United States against Mora, is certainly sufficient. We do not need a new rule that there has to be direct evidence linking criminality to the new address, and therefore the defendant loses on that requirement for the new rule. One thing that I found a little troubling here was the Court held a hearing that appears to be much like a Franks hearing and then said, well, I'm not going to consider any of the evidence that you came forward with at this hearing. That seems rather odd to me. I mean, shouldn't the Court, once it holds the hearing and allows the defendant to come in and put on evidence, shouldn't that evidence then be part of the analysis? This Court has the power to make such a rule. I am not aware of such a rule already existing. As you saw with your review of the transcript in Volume 3, Judge Garcia did not do this because it's what I asked him to do. But it does appear, I mean, it is a quasi-Franks hearing. Yes. I would say yes. And we know that if Judge Garcia had held a Franks hearing as a matter of grace rather than of right to borrow from Herrera, I would lose if I complained about that, and I'm aware about that. I went to that hearing prepared to help Special Agent A.C. defend himself against this attack against his integrity, against his honesty by Ms. Johnson, who was trial counsel for Mr. Kangro. And then I was as surprised as anyone to read the order that was published afterwards. I couldn't find any case from the Tenth Circuit that says the technique that Judge Garcia used is not allowed, so I don't think it's reversible. But also importantly, what Mr. Kangro has not briefed here is how it would move the needle if you considered the exhibits that were introduced at that hearing but that were not attached to the motion in which Mr. Kangro sought the hearing. You don't have any analysis before you of, oh, well, if the transcript of the probation search came in, that would have sufficiently undermined probable cause so that Judge Molson wouldn't have granted the warrant for the new Euclid address. Or Brian A.C., assuming this panel finds that probable cause is deficient, despite all my arguments and despite the contents of the affidavit itself. Let's say this panel says the affidavit was sufficient such that we need to rely on good faith, as the district court did. There's no analysis that says if these exhibits came in, here's how you would know that Brian A.C. didn't serve that warrant in good faith and therefore government loses. That has just not been briefed to the court. Is it more than exhibits? Was there testimony that would fall under that as well? Yes, and it's my position that there was not really any persuasive power behind the testimony, which may or may not be why Judge Garcia ended up taking the procedural route that he took. Well, you say it as though it was by design. Was it just confusion? So as I, and I'm mostly trying to refer to Volume 3, which is the transcript. There was a point at which I had Brian A.C. on the stand, and he was talking about his good faith and how he has great respect for Judge Molson and does whatever she tells him, you know, expeditiously. And Judge Garcia indicated that he found the dialogue boring or that he wasn't interested in that and that he wanted to talk about the facial warrant challenge. And I told him, I said, the CMECF notice we got was that the court was setting a hearing on the defendant's motion for a hearing, and the hearing the defendant moved for was a Franks hearing. So I showed up ready for a Franks hearing. Brian A.C. showed up ready to defend his honor against these attacks from Ms. Johnson. The defendant showed up for a Franks hearing. Yes, she was ready. Ms. Johnson was ready. She had her own witness who testified after Brian A.C. But in this dialogue with Judge Garcia, he basically said, listen, you know, I'm just not very interested in this. I'll let you make your record if you want. And what I said to him was, it's not a matter of, and I think I'm recalling my words correctly, but please look at the transcript, Volume 3, to be sure. It's not that I want to make a record. There's an open attack against the integrity and the honesty of this agent. And if you say Franks challenge denied, defendant loses on Franks, okay, we can move on to oral argument on whether there's PC on the face of the affidavit. But while the attack on Brian A.C. remains live, I'm not going to stop doing my job as a government attorney to defend him. And he's certainly not going to quit giving true and faithful testimony under oath to help the court understand his good faith in executing Judge Molson's warrant. And then after Special Agent A.C. testified, the defense investigator testified, whose job someone might disagree, I consider her to have been called to criticize Brian A.C. and say how she would do better. That's all very interesting, but at the end of the day, for me, the question is, how do you hold a hearing which is, you know, looks like a Franks hearing, quacks like a Franks hearing, everybody treats it as a Franks hearing, and then you say, I'm going to make my decision, but I'm not going to look at any of the evidence that we took during this Franks hearing. I find that rather odd. I have never seen it before, Your Honor, and I did not invite it, as you see from the record. Okay, so let's, before we run out of time. Yes. What if we say we don't want to deal with any of this, and we just say, let's look at the good faith exception. According to your friend, we can't apply the good faith exception here. Do you think that that is correct, and if not, why? I think it is deeply misguided. As you can see from Erlinda Johnson's proposed affidavit, even with all the additions the defense would want, and even with all the deletions the defense would want, the affidavit is not so lacking in probable cause that Brian Acy wouldn't trust that Judge Molson granted it correctly, meaning what we heard today was essentially a facial bad faith challenge that the affidavit was so obviously lacking in nexus that Brian Acy would not trust that Judge Molson granted it correctly, and that is just not following this court's law as set out in United States against Cotto, United States against Roach, United States against Campbell, which are all cases about even a minimal nexus is enough to support the good faith execution of a warrant. Here, our position is the nexus was entirely sufficient to contain probable cause, but even if we skip ahead to good faith analysis as Judge Garcia did, there is nothing deficient on the nexus to drop it below the cases in which this court had said the execution was in good faith. Additionally, if you do look at the transcript, you will see that none of the statements Special Agent Acy made in that affidavit were, the United States takes the position they weren't wrong, but even if they were incorrect or incomplete, then they were not material to probable cause or they were not. Additionally, they were not recklessly made. There is one thing I do want to focus a little bit on in the very little remaining time I have, and it's this idea that Brian Acy is supposed to believe James Kangro when Kangro says he's no longer involved with the soldiers of Aryan culture, despite sending new selfies after getting out of prison with the swastika tattoo still on his stomach, despite the soldiers of Aryan culture tattoo still across his stomach, even though as Special Agent Acy testified, people who go to federal prison and are on federal supervision afterwards have access to services to remove or to cover up tattoos like that. Special Agent Acy specifically said in the affidavit that one of the components of his training and experience is that folks will lie to conceal their gang ties. And I'm directing your attention to paragraph 44, which is on page 58 of Volume 2, Record on Appeal. Much of the complaining from the defense about the soldiers of Aryan culture, which is essentially, by the way, background. There is a few, very few paragraphs in which Special Agent Acy describes on pages 51 and 52 that soldiers of Aryan culture, but the reason he's asking for the affidavit is the saying that he can provide fentanyl, saying that he has guns and fentanyl to sell. Call him if you need them. And then the investigation that leads to his new location. The soldiers of Aryan culture stuff is fundamentally immaterial. I see that I'm out of time. Let me, with regard to the pictures included of the cat with the gun, should he have revealed that that was not a gun, that it was a, what was it, an air gun? I, so one of the, if I may answer despite my lack of time, Your Honor. Yes, please. The search where the guns were sought but the probation office told Laura Christie in advance they were coming and then they found real Glock magazines and a real Glock magazine loader and then got some pictures of guns with a cat. I don't know whether that particular gun was an airsoft gun or a real pistol. It doesn't look like a Glock to me, I can tell you that. Brian Acey wasn't the guy who did that search. Brian Acey found out about that search that had previously been done by the probation officer. And so he wasn't there for the dialogue. He wasn't there for the description of the gun. He wasn't there to say, are you telling me this gun in the photo is an airsoft gun owned by your son? And then he wasn't there to see Laura Christie's demeanor when she answered that question. It just, he's picking up this investigation later. There's no real way for him to know whether that picture is of a real gun or not. So we take the position, the United States takes the position that he didn't do anything reckless by telling the judge what he knew and he didn't know that that wasn't a real pistol. And also, I don't have any indication that he was present for or have ever had the transcript of the dialogue from that probation search that Ms. Johnson tried to enter into the record at the, let's call it a Frank's hearing. You saw, if you read volume three, my objection to that exhibit, which is that it wasn't authenticated by anyone who was a participant in the conversation. It was just something that they hired a non-participant to write out based on the audio recording. Subject to any other questions, that's what I have. And the United States respectfully requests this panel affirm the decision of the district court. Thank you. Thank you. Let's give counsel another two and a half minutes so the time has been even. You don't have to use it. Thank you, Your Honor. Thank you, Your Honors. First, I would like to address the point about the Frank's hearing. While it is unclear what exactly process happened here on page 111 of the hearing transcript, Judge Garcia does say he will allow the hearing, presumably meaning the Frank's hearing. And the fact is that Judge Garcia did allow evidence and it was pertinent to the issue at hand. In U.S. v. Herrera, the court stated that we should err on the side of more process to see that justice is done. And the issues at hand are showing in the information that was excluded by Judge Garcia that was attached and presented at the Frank's, not Frank's hearing, show the reckless cherry picking of evidence and information that Agent Acey included in his affidavit to the magistrate as the drafting and executing officer, including citing to the probation officer memo where it in fact does say on the same page that the gun with the cap was an airsoft gun. So he had that information. It was on one single page that he cited to. And even if we say that Agent Acey says in the hearing transcript at pages 69 through 70 that things would have been different had this information been included, like the dropout information that a kangaroo did in fact drop out of the SAC. And an agent with 22 years of experience knows the law, knows that a nexus is required. And unlike my opposing counsel here said, that it's not just a nexus between criminality and the defendant and the defendant and the home. It's evidence of criminality and the home, as is shown in U.S. v. Nolan, where it states that even repeated instances of drug activity outside the home is not enough for a nexus. Thank you. Thank you, counsel, for your arguments. The case is submitted. Counsel are excused.